# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 2:22-cr-19-3 |
| | : | |
| Plaintiff, | : | JUDGE GRAHAM |
| v. | : | |
| | : | |
| JACKSON MATTHEW SAWALL, | : | **GOVERNMENT'S SENTENCING** |
| | : | **MEMORANDUM** |
| Defendant. | : | |

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Jackson Matthew Sawall ("Defendant" or "Sawall"). For the reasons set forth herein, the United States recommends the Court impose a sentence of 92 months of imprisonment, followed by thirty years of supervised release, to include the conditions agreed upon by the parties in the Plea Agreement (Doc. #6), and order the forfeiture of the agreed upon property in this case. The recommended sentence falls within the properly calculated guideline range after consideration of all applicable departures and variances.

I. **Factual Background**

This case is not simply about the destructive terroristic means devised to sow mayhem and division among Americans. Fundamentally, the actions of Sawall and his coconspirators were inexorably linked with their singular end goal: the propagation and fruition of white supremacist ideology. From about October 2019 to March 2020, Sawall—along with Christopher Brenner Cook ("Cook") and Jonathan Allen Frost ("Frost")—conspired and agreed to provide material support, resources, training, weapons, explosives, and personnel, knowing and intending they were to be used in preparation for and in carrying out an attack on the United States power grid. This

1

conspiracy to provide material support to terrorists was designed to create confusion, unrest, and—in the coconspirators' estimation—a ripe opportunity for white leaders to take control of the country and the government. The coconspirators acknowledged that people would die if they achieved their goal of causing a widespread power outage. Sawall played an integral role in this plan of destruction and division by attempting to recruit others, financially supporting the group's mission, and running the online propaganda chat group.

Cook and Frost initially met in an online chat group where they discussed the idea of attacking the nation's power grid. By late 2019, Sawall joined the group and began assisting Cook with recruitment efforts. As part of these efforts, Cook circulated a reading list that promoted white supremacy and Neo-Nazism ideology. Two of these books, entitled "Siege" and "A Squires Trial," encourage aggrandizing power through violence. Cook specifically sought out younger recruits (including juveniles) because he believed they were less likely to be law enforcement.

One of Sawall's primary responsibilities was to run the propaganda group called "The Front." If the attacks went according to plan, "The Front" intended to claim responsibility for the attacks. Two more exclusive subgroups were created for those who passed additional screenings. Communications between Sawall and his coconspirators often occurred on encrypted apps and platforms for operational security; members of the chat groups, including Sawall, also changed their screennames or monikers frequently. Cook shared plans to attack the power grid with the first subgroup named "Lights Out." Specifically, Cook shared a link to a U.S. Department of Energy report that detailed information relating to the grid and the difficulties of timely replacing large transformers. The precise details of the planned attack were only shared with a smaller subgroup called "Lights On," which consisted of Sawall, Cook, Frost, and a few others. In January 2020, Cook shared a YouTube link concerning an explosion with the "Lights On" group. Frost, who

responded that the explosion would be "a pretty good distraction," subsequently purchased the materials for explosives and began testing at least one device.

Initially, the group took on a cell structure: Sawall was responsible for the attack in the Midwest, Cook was responsible for the attack in the Northeast, and Frost was responsible for the attack in the Southwest. The planned attacks in the Southeast and Northwest were to be carried out by two other individuals. The logistics later changed, however, and one person would be responsible for attacking each substation. Defendants planned to attack substations with powerful rifles that would penetrate the transformers. Not only did they believe this would cost the government millions of dollars, but they envisioned the following electrical disruption would cause confusion and unrest. There was even discussion that their plan could succeed in producing a race war and the next Great Depression. The coconspirators' aim was to tear down the system to create an opportunity for white leaders to gain power.

Rather than a fleeting fascination, Sawall and his coconspirators were deeply devoted to this conspiratorial cause. In fact, Sawall and Cook both expressed their commitment to die for their cause. "I can say with absolute certainty that I will die for this effort. I swear it on my life," stated Sawall in a chat group, to which Cook responded, "I can say the same." After discussing the idea of suicide necklaces that could be ingested if they were caught by the authorities, Frost made suicide necklaces and filled them with fentanyl. In February 2020, Frost provided the necklaces to Sawall and Cook. Soon thereafter, Sawall swallowed his necklace during a traffic stop in Columbus, Ohio, though he ultimately survived.

Sawall's, Cook's, and Frost's commitment to their radical ideology turned from ideas to concrete actions in furtherance of the attacks. After researching the April 2013 attack on the Metcalf Transmission Substation near San Jose, Frost believed that a powerful caliber would be

3

necessary to penetrate the transformers. With this information in mind, Frost obtained several AR-47 rifles. Frost purchased 80% receiver kits online—which do not carry serial numbers—and built the remainder of the rifles. In February 2020, Sawall, Frost, and Cook met in Columbus, Ohio. There, Frost sold Cook one of these untraceable AR-47s to perpetrate the attack. Frost then trained Cook how to shoot the rifle at a shooting range. Notably, Sawall offered to provide funding to purchase additional weapons.

This February 2020 meeting between Sawall, Cook, and Frost in Columbus also served as an opportunity for the group to detail logistics and propaganda for the planned attack. In another offer of financial support, Sawall paid for the group's hotel room and other travel expenses during this trip. While in Columbus, Sawall and Cook posed for a photo with a swastika with the words "Join the Front," which they had spray-painted under a bridge. They also planned to hang propaganda, spray paint a mosque, and cut down a telephone pole (with a chainsaw purchased by Sawall) to propagandize "The Front." However, a traffic stop of Sawall, Cook, and Frost—during which Sawall ingested his suicide necklace and survived—disrupted these plans. A search of Sawall's vehicle revealed the AR-47, additional firearm magazines, a Nazi flag, spray paint, and white supremacist propaganda.



*Pictured left to right: Sawall and Cook; Photographed by Frost.*

4

Despite this encounter with law enforcement, the group continued to progress with recruitment and preparation of the attacks. In March 2020, Cook and Frost traveled to Oklahoma and Texas, where they attempted to meet with additional recruits along the way (the recruits included juveniles). Once again, on March 15, 2020, while in Texas, Cook and Frost were stopped by law enforcement; a search of the vehicle revealed a Nazi flag, several military uniforms, burner phones, and fentanyl from the suicide necklaces.

In August 2020, law enforcement executed search warrants on Sawall's, Cook's, and Frost's residences, which revealed the extent to which the Defendants still clung to their desire to cause economic turmoil and death in furtherance of their ideology. The search of Sawall's home revealed information about "The Front," its recruitment tactics, and an oath of allegiance. Law enforcement also discovered written statements—such as "Revolution is our solution"—on memo pads in Sawall's residence. Sawall's cell phone contained propaganda from "The Front" as well as photos of "Join The Front" and Nazi graffiti. Agents found the following items in Cook's residence: an unassembled rifle (not the one purchased from Frost), a copy of the book "Siege" in his bedroom on his nightstand, racially motivated violent extremism Nazi material, the cell phone used to communicate with his coconspirators, a tactical magazine, and camouflage clothing. In Frost's home, FBI agents found multiple firearms, including an AR-15 pistol without a serial number, chemicals and components capable of building explosives, racially motivated violent extremism Nazi material, and information about the United States' power infrastructure.

  

## II. Procedural History

On February 7, 2022, the U.S. Attorney for the Southern District of Ohio filed a one-count Information charging Sawall, Cook, and Frost with Conspiracy to Provide Material Support to Terrorists. On February 23, 2022, Sawall pleaded guilty to Count 1 of the Information pursuant to a Rule 11(c)(1)(B) Plea Agreement and attached Statement of Facts.

## III. Sentencing Guidelines Calculation

a. <u>Statutory Maximum Sentence</u>

The maximum sentence for Conspiracy to Provide Material Support to Terrorists is 15 years of imprisonment, a life-time term of supervised release pursuant to 18 U.S.C. §§ 2332(b)(g)(5) and 3583(j), a $250,000 fine, forfeiture, and a mandatory special assessment of $100 due prior to sentencing.

b. <u>Sentencing Guidelines Calculation</u>

In imposing a sentence, the Court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). The parties agreed to the following advisory sentencing guideline factors. Pursuant to U.S.S.G. § 2X2.1, the base offense level for aiding and abetting is the same as the underlying offense; the base offense level for an 18 U.S.C. § 1366(a) violation is **6**. U.S.S.G. § 2B1.1. Here, the level is increased to **14** because the offense involved possession of a dangerous weapon pursuant to § 2B1.1(b)(16). Because this felony offense involved or was intended to promote a federal crime of terrorism, the offense level is increased to **32** pursuant to § 3A1.4(a). Finally, if Sawall continues to comply with the terms of § 3E1.1, there is a **2**-level reduction for acceptance of responsibility and a **1**-level reduction for

6

Sawall's timely notification of his intent to plead guilty. This brings Sawall's offense level—as contemplated and agreed by the parties—to **29**. In light of § 3A1.4(b), Sawall's criminal history category is VI. Together, this corresponds to a guideline range of 151-188 months. The parties additionally recommend that this Court impose a 30-year term of supervised released to be served after the completion of the term of imprisonment that this Court finds appropriate.

   c. <u>Defense Objections</u>

The PSR recommends that Defendant receive a 4-level enhancement for being an organizer or leader of a criminal activity involving five or more participants. Defendant objects to its application. This specific enhancement was not contemplated by the parties' Plea Agreement, and it should not apply. Sawall, Cook, and Frost acted as co-equals throughout the conspiracy. To be sure, U.S.S.G. § 3B1.1 cmt. 4 recognizes that there may be more than one leader in a conspiracy. Here, however, the commentary's factors do not point to Sawall's leadership status.[1] The trio shared decision-making authority, and none enjoyed a larger share of the fruits of the conspiracy.

Defendant also objects to the 2-level enhancement for Defendant using or attempting to use a person less than 18 years of age to commit the offense. U.S.S.G. § 3B1.4. While this enhancement applies because, as part of the conspiracy, attempts to recruit minors were made, it was not included in the Plea Agreement. The Government will accordingly honor its agreement to recommend the Sentencing Guidelines enumerated within the Plea Agreement.

---

[1] "In determining whether a defendant was an organizer or leader, courts consider the following factors: 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.'" *United States v. Griffin*, 829 F. App'x 108, 109 (6th Cir. 2020) (quoting U.S.S.G. § 3B1.4, cmt. n.4).

## IV. Proper Sentence

After properly calculating the guideline range, the Court must next consider all the sentencing considerations set forth in Section 3553(a). Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;
> (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (5) the guidelines and policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

***The Nature and Circumstances of the Offense.*** As set forth above, the nature and circumstances of this offense are hateful, dangerous, and contemplated an attack resulting in enormous economic costs and the death and destruction of our entire way of life by replacing the leaders of our Republic with white supremacists. Conspiring to synchronously attack the United States power grid nationwide is a serious and destructive offense, the gravity of which is heightened by the underlying motivation: Sawall and his coconspirators were fueled by white supremacy ideology. In the minds of Sawall and his coconspirators, the racially motivated end justified the means. "Revolution is our solution," a phrase written on a memo pad found in Sawall's residence, succinctly summarizes the conspiracy's goal. White supremacy ideology covered the "The Front" chat group, and it was engrained in new recruits. Extremist material was discovered on Sawall's phone and within the Cook and Frost residences. The national power grid was targeted precisely for the damage that they hoped to inflict – both in terms of economics and life. The group

8

fantasized about the attacks triggering a race war, a depression, and the opportunity for white leaders to take control of this country and its government. Sawall and his coconspirators acknowledged that causing a widespread power outage would result in the deaths of Americans, yet this did not deter them.

The calculated material steps that Sawall and his coconspirators made towards the power grid attacks—paired with Sawall's espoused willingness to die for the cause—underscore the crime's seriousness. Rather than a destructive idea in its infancy, the coconspirators made concerted progress to effectuate their goal. Defendants extensively researched and discussed their plan, and Sawall played an integral role by attempting to recruit others, financially supporting the group's mission, and running the online propaganda chat.

Defendants planned to attack transformers with powerful rifles; specifically, Sawall would be responsible for the attack in the Midwest. In February 2020, Cook purchased an AR-47 with no serial number from Frost to carry out the attack. Sawall pledged to financially support the purchase of additional rifles to carry out their conspiracy and provided financial support for their Columbus meeting. A search of Frost's home later revealed materials for making explosives and evidence of at least one test of an explosive device. The coconspirators' experimentation with explosives and possession of assault rifles exponentially increases the dangerousness of the offense.

This court must consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Because Sawall committed a serious terrorism offense for malicious reasons,[2] anything less than a correspondingly serious term of imprisonment would spurn respect for the law at the expense of justice.

---

[2] *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave

***The History and Characteristics of Defendant.*** According to the PSR, Sawall "experienced a somewhat unstable childhood." (PSR ¶ 115). Sawall's parents divorced when he was a toddler, and Sawall did not have contact with his father between the ages of two and nineteen. In October 2019, Sawall's mother passed away from cancer. Despite this turmoil, Sawall received support from his grandmother and grandfather in recent years, and he has since built a strong relationship with his father. Sawall claims that his only goal since the age of 12 was to join the military, but this dream was shattered when he learned that a medical condition disqualified him from enlisting. Unfortunately, when this door closed, Sawall refocused his ambitions into white supremacy ideology and the conspiracy to cause harm at the center of this case.

This is not the first time Sawall has stood before a judge for sentencing. In 2018, he was convicted of theft and entering property after breaking into a residence and stealing, among other things, four firearms. Sawall's disregard for others' property and the law is nothing new. Rather, it has played out again in a much greater way in the current case. The fact that Sawall stole firearms in the past is especially alarming given his involvement with this white-supremacist-inspired conspiracy and his history of mental health.

Sawall has been attending counseling regularly since January 2022, which he has found beneficial, and he appears open to continued mental health counseling. The Government commends Sawall's openness to counseling, but the Government also submits that a transition will not take place overnight, or even in two years. As such, the Government tailored its recommended sentence to ensure that Sawall receives the support he needs during his progression. The Government submits that its recommended 92 months of imprisonment, followed by 30 years of

---

threat…, and thus that terrorists and their supporters should be incapacitated for a longer period of time."); *United States v. Mumuni*, 946 F.3d 97, 112-13 (2d Cir. 2019) (quoting *Meskini*, 319 F.3d at 92) ("Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal.").

supervised release, appropriately allows Sawall to make his first steps in that process without unduly ignoring the other Section 3553(a) factors. The terms of release were specifically tailored with Sawall's mental health in mind. The parties agreed to terms of mental health treatment as well as violent extremism counseling. Thus, the sentence comports with Section 3553(a)(2)(D) by providing Sawall with the needed medical care and correctional treatment.

Although 19 years old when the conspiracy began, Sawall's childhood required that he mature quickly and there is no doubt he understood the nature of the conspiracy. Sawall is before the Court for an unusually serious offense[3]—the gravity of which overshadows any conceivable mitigating circumstances.[4] Nevertheless, the Government submits that its proposed sentence appropriately accounts for mitigating circumstances and the nature of the terrorism offense.[5]

**The Need to Afford Adequate Deterrence to Criminal Conduct.** Deterrence to criminal conduct must be considered as this Court imposes its sentence. 18 U.S.C. § 3553(a)(2)(B). Here, both general and specific deterrence counsel towards the Government's suggested incarceration sentence of 92 months. Sawall and his coconspirators encountered law enforcement during a traffic stop in February 2020. During this encounter with law enforcement, Sawall ingested his suicide necklace and survived. Though Sawall appears to have somewhat distanced himself from the conspiracy after this event, the August 2020 search of Sawall's residence revealed that he was still

---

[3] Terrorism offenses are uniquely serious. *See, e.g., United State v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) (affirming 180-month sentence for 18-year-old after sentencing judge concluded that the terrorism offense was "gravely serious" despite defendant's age); George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 CORNELL J.L. & PUB. POL'Y 517, 546 (2014) ("Terrorism is different from other crimes. Terrorist acts can intimidate a civilian population and disrupt entire communities…. The [terrorism] enhancement represents a major national policy goal.").

[4] District courts enjoy discretion to "emphasize the nature of the crime over the mitigating factors." *United States v. Zapata*, 589 F.3d 475, 488 (1st Cir. 2009).

[5] As one district court noted, a person's reasons for being more susceptible to joining a terrorist group, "whether it be family background, social alienation, school difficulties, or even the lack of any worthy ambition," may "explain, [but] do not excuse, the decision to join a terrorist organization." *United States v. Bell*, 81 F.Supp.3d 1301, 1324 (M.D. Fla. 2015).

committed to the cause. Information about "The Front," its recruitment tactics, propaganda, and an oath of allegiance were all discovered during the August 2020 search well after the traffic stop. Because Sawall was not fully deterred by the police encounter and swallowing an intended suicide necklace, his sentence should account for specific deterrence.

Moreover, even if the Court accounts for Sawall's expressed remorsefulness, general deterrence warrants a significant sentence of incarceration. Domestic terrorism is on the rise.[6] Others thinking about conspiring to commit acts of terrorism—especially for racially-motivated ends—must receive an unequivocal message: such behavior will not be tolerated by the United States criminal justice system. *See United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) (noting approvingly of the district court judge stating that "'a great need for general deterrence' existed because people must know that they will be punished for 'assisting terrorist organizations'"); *United States v. Doe*, 323 F.Supp.3d 368, 390 (E.D. N.Y 2018) ("General and specific deterrence play a large part in the court's considerations, particularly given the increasingly common nature of terrorism-related crimes.").

***The Need to Protect the Public from Further Crimes of the Defendant.*** In fashioning its sentence, the Court must next consider the need to protect the public from Sawall's further crimes. 18 U.S.C. § 3553(a)(2)(C). Considering that Sawall conspired to attack the national power grid with powerful assault rifles and expressed his willingness to die for the white supremacist cause, he presents a threat to the public.[7] Not only would execution of the conspiracy have disrupted

---

[6] Robert O'Harrow Jr., et. al., *The Rise of Domestic Extremism in America*, WASHINGTON POST (April 12, 2021), https://www.washingtonpost.com/investigations/interactive/2021/domestic-terrorism-data/.

[7] The unique nature of Sawall's terrorism-related crime should influence this Court's perception of public safety even considering Sawall's expressed remorse. *See, e.g., United States v. Bell*, 81 F. Supp. 3d 1301, 1325 (M.D. Fla. 2015) ("However, unlike other crimes, where, in a close case, the Court might give the benefit of the doubt to a seemingly remorseful defendant, terrorism-related crimes are different. Terrorism endangers the lives and property of the public at large, seeks to weaken or destroy societal

critical infrastructure and the daily activities of Americans, as well as potentially having severe economic consequences for the country, but—as Defendants themselves realized—it likely would have resulted in deaths. Sawall's recognition of the expected deaths displays a callous disregard towards human life.

Even more fundamentally, Sawall conspired to attack the power grid precisely *because* of the destruction and anarchy that he believed would result from the attack. By intending to destabilize society in hopes of a white supremacist agenda, Sawall conspired to strike at something existentially deeper to this country than electric transformers: the bonds between citizens and the rule of law itself. Sawall's largely undeterred actions in this conspiracy cannot be downplayed as a string of anomalies. Therefore, despite Sawall's expression of remorsefulness, he was still willing to harm others and he remains a threat to the public.[8]

***The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.*** The term of imprisonment recommended by the Government prevents unwarranted sentence disparities pursuant to 18 U.S.C. § 3553(a)(6). While a perfect comparator case does not exist for Sawall's precise situation and offense, several cases provide useful insight. From a broader perspective, a common thread runs through terrorism sentencing nationwide: heavy terms of incarceration are the general rule rather than the exception. This rings true for the charge at issue in this case—conspiracy to provide

---

institutions, and tries to spread as much fear and panic as possible. While the Court hopes that [defendant]'s disavowal of this path is real, the need to protect the public from further crimes of this defendant remains an important consideration.").

[8] *See United States v. Bell*, 81 F. Supp. 3d 1301, 1325 (M.D. Fla. 2015) ("However, unlike other crimes, where, in a close case, the Court might give the benefit of the doubt to a seemingly remorseful defendant, terrorism-related crimes are different. Terrorism endangers the lives and property of the public at large, seeks to weaken or destroy societal institutions, and tries to spread as much fear and panic as possible. While the Court hopes that [defendant]'s disavowal of this path is real, the need to protect the public from further crimes of this defendant remains an important consideration.").

material support to terrorists. *See, e.g., United States v. Bell*, 81 F. Supp. 3d 1301, 1321 (M.D. Fla. 2015) (Between 2009 to 2013, there were twelve cases where the only count was § 2339A. "[T]he average sentence was 116 months, and the median sentence was 114 months.").

The following comparable cases elucidate that the Government's recommended sentence for Sawall is well within the vicinity of sentences for similar terrorist conduct in other cases. First, consider a case close to home. Three defendants—two of whom were 20 years of age—were sentenced to 138 months, 117 months, and 97 months for conspiring to use explosives to destroy the Brecksville-Northfield High Level Bridge in the Northern District of Ohio.[9] After purchasing inert C-4 explosives from an undercover FBI agent, the defendants placed the explosives on the base of the bridge and attempted to detonate the devices. *United States v. Wright*, 2012 WL 5507254, at *7 (N.D. Ohio Nov. 14, 2012), *aff'd,* 747 F.3d 399 (6th Cir. 2014). Like Sawall, these young defendants acknowledged that their plan to evoke fear and sow division likely would kill people, yet they remained undeterred. *Id.* at *6. Similarly, another defendant was recently sentenced to 96 months of incarceration for conspiring to damage an energy facility. *United States v. Reznicek*, 2022 WL 1939865, at *1 (8th Cir. June 6, 2022) (affirming 96-month term of imprisonment for defendant who committed arson and vandalism to cut holes in the Dakota Access Pipeline to save the environment and preserve human life as opposed to the purpose of the instant conspiracy that wanted to upend life and cause death).

The fact that Sawall and his coconspirators did not succeed in their plans does not eliminate the need for a heavy term of imprisonment. Take, for example, the case of Shelton Bell; at 19 years old, he became fascinated by Anwar al-Awlaki and jihadism. *United States v. Bell*, 81 F.Supp.3d

---

[9] *Three Men Sentenced to Prison for Roles in Plot to Bomb Ohio Bridge*, Federal Bureau of Investigation (Nov. 20, 2012), https://archives.fbi.gov/archives/cleveland/press-releases/2012/three-men-sentenced-to-prison-for-roles-in-plot-to-bomb-ohio-bridge.

1301, 1304 (M.D. Fla. 2015). Bell eventually traveled to the Middle East, but he was captured and brought back to the United States before killing or injuring anybody. *Id.* Bell pleaded guilty to one count of conspiring to provide material support to terrorists and one count of attempting to provide material support to terrorists. *Id.* at 1305. Even though Bell's intended violent plans never came to fruition, the court explained that the inchoate nature of the crimes was built into the guidelines sentence. *Id.* at 1317. The sentencing court further noted that Bell (like Sawall) was "very young," that he "could be counseled in prison" and that his post-release activities can be "closely monitor[ed]" during a lifetime period of supervised release. *Id.* at 1325. Bell was sentenced to a term of incarceration of 240 months. *Id.*

That Sawall and his coconspirators were motivated by white supremacist ideology rather than jihadist sentiment or other motivations does not remove this case from the heartland of terrorism cases. After all, as previously described, the conspiracy at bar squarely evokes "the serious dangers posed by *all* forms of terrorism." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added). Ultimately, Sawall and his coconspirators intended to use the same playbook as any other terrorist: "to instill fear and to strike at basic societal institutions." *Bell*, 81 F.Supp.3d at 1324 (unlike Bell, Sawall and his coconspirators approved of killing Americans in the homeland).

In sum, the overwhelming national consensus is that terrorism cases are serious offenses that warrant heavy sentences of incarceration.[10] After accounting for Sawall's history and characteristics, which are not particularly mitigating, there is no justifiable reason to vary from the

---

[10] Again, this is true even though Sawall's conduct did not result in death or physical injury. *See Mumuni*, 946 F.3d 97, 113 ("Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard as to whether…the defendant's conduct failed to achieve its intended deadly consequences.' Thus, in determining what constitutes a 'sufficient' sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of the § 3553(a) factors."

consensus that other courts have followed in the context of sentencing for similar terrorism-related cases. After all, this consensus is built upon the mutual recognition by Congress, the Sentencing Commission, and the public that terrorism offenses are serious and must be punished accordingly.

*Forfeiture.* While there is no restitution owed in this case, Sawall agreed to abandon any right, title, or interest he may have in the property listed in the Forfeiture Allegations in the Information.

## V.     Conclusion

For the reasons set forth above, the United States respectfully recommends that Defendant Jackson Matthew Sawall be sentenced to a term of imprisonment of 92 months followed by thirty years of supervised release. The Government submits that this sentence is sufficient but not greater than necessary to satisfy the statutory purposes set forth in 18 U.S.C. § 3553(a).

KENNETH L. PARKER
United States Attorney

*s/Jessica W. Knight*
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney
JUSTIN SHER (DC974235)
Trial Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 469-5715
Email: Jessica.knight@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Government's Sentencing Memorandum* was electronically served via the Court's CM/ECF system this 28th day of October, 2022 upon Counsel for Jackson Matthew Sawall.

*s/Jessica W. Knight*
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney