**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:22-CR-19 |
| | : | |
| Plaintiff, | : | JUDGE GRAHAM |
| | : | |
| v. | : | **SUPPLEMENT TO SENTENCING MEMORANDUM** |
| | : | |
| JACKSON SAWALL, | : | |
| | : | |
| Defendant. | : | |

Now comes Jackson Sawall, through counsel, and submits the following supplement to his previously filed *Sentencing Memorandum* (Doc. 96).

Respectfully submitted,

JOSEPH MEDICI
Federal Public Defender

*/s/ Soumyajit Dutta*
Soumyajit Dutta (OH 76762)
Office of the Federal Public Defender
10 W. Broad Street, Suite 1020
Columbus, Ohio 43215
Telephone: 614-469-2999
E-mail: Soumyajit_Dutta@fd.org

1

I. INTRODUCTION AND PROCEDURAL HISTORY

On February 23, 2022, Jackson Sawall (hereafter "Jackson" or "Mr. Sawall" alternately) entered a plea of guilty to Count 1 of an Information filed by the United States. Count 1 charged Mr. Sawall with Conspiracy to Provide Material Support to Terrorists per 18 U.S.C. §§2339A(a), 2332b(g)(5)(B), and 3583(j).

On December 1, 2022, this Court, in advance of Mr. Sawall's scheduled sentencing revoked his bond after reviewing a number of documents detailing past mental health concerns. This Court identified those concerns as possibly creating a substantial risk to the safety of himself and to the community and that he presented a substantial risk of flight. (Doc. 94)

After an evaluation of Mr. Sawall was completed at the Court's request by Dr. Jolie Brams, this Court conducted a civil commitment hearing per 18 U.S.C. §4244(d). This Court would go on to find that by a preponderance of evidence, Mr. Sawall was presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment. (Doc. 132) After the Court provisionally sentenced him to fifteen years incarceration, Mr. Sawall was subsequently sent to FMC Butner for this purpose.

On February 21, 2024, the warden at Butner delivered a Certificate of Recovery and Request for Discharge From Psychiatric Hospitalization to this Court indicating that Mr. Sawall had recovered from his mental disease or defect to such an extent that he no longer was in need of psychiatric hospitalization on a committed status. (Doc 154). This Court subsequently scheduled the matter for sentencing. (Doc. 156)

## II. SENTENCING FRAMEWORK AND MOTION FOR DOWNWARD DEPARTURE

Per the calculation by the U.S. Probation Office, Mr. Sawall carries an offense level of 35 and a Criminal History Category of VI. At these parameters, the advisory guideline range is the statutory maximum of 180 months in prison. There have been a number of objections filed by defense counsel that the Court is aware of that were made into an additional addendum to the Pre Sentence Report (PSR). Ultimately, it is expected that the United States will be recommending a sentence perhaps less than the 92 months of incarceration it had originally requested based on a calculation of Offense Level 23 and Criminal History Category VI but still a sentence of further incarceration.

<u>Motion for Downward Departure</u>

Per, U.S.S.G. §4A1.3(b)(1) this Court can consider a downward departure if it believes that a Defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

In this matter, Mr. Sawall would posit that his criminal history score is overstated as a result of the enhancement per U.S.S.G. §3A1.4(b), which calls for a defendant with Mr. Sawall's offense of conviction to be automatically placed into a Criminal History Category of VI.

Despite the Government's admonishments in its original Sentencing Memorandum, all evidence points to a young man who has gone through significant and remarkable rehabilitation. This is no longer a person who subscribes to the philosophies of terror and racial upheaval that drove these actions. In fact, this Court would be well justified in finding that the actions committed by Mr. Sawall never did reflect his true own nature, but rather reflected a greater

3

yearning to be a part of something, anything that would give him that sense of belonging and connection that he desperately desired.

The one size fits all nature of U.S.S.G. §3A1.4(b) also flies in the face of the goals of sentencing. Without question, the enhancement fails to distinguish between those codefendants with varying levels of involvement within the same case, as is the situation here. Perhaps more importantly, the enhancement fails to distinguish between a defendant who has committed no prior offenses with one who has a lengthy criminal record. This potentially produces an unwarranted sentencing similarity proscribed by the U.S. Supreme Court. See, *Gall*, 552 U.S. at 55-56 (recognizing that avoiding unwarranted similarities is a companion consideration to avoiding unwarranted disparities)

It bears noting that while the Court was not in a position to previously consider this argument given the way Mr. Sawall's case unfolded, it is in a position to do so now. Perhaps, most telling, this Court has previously used this logic and granted this departure in the case of one of Mr. Sawall's co-defendants, Jonathan Frost.

If this Court were to agree with Mr. Sawall's analysis, Mr. Sawall's criminal history points would fall to one, thereby putting him in Criminal History Category I. At these parameters (COL 23, CH I), Mr. Sawall's advisory guideline range would fall to 46-57 months.

Even using this framework, however, provides an advisory guideline range that is not commiserate with the essence of this case and the young man who pled guilty to it. Mr. Sawall acknowledges that his offense is extremely serious for the reasons outlined in the Government's Sentencing Memorandum. Nonetheless, a period of time served (approximately 16 months) with a significant period of supervised release would adequately reflect the seriousness of his offense, promote respect for the law and provide just punishment. "It is appropriate for a court, when

considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Pelloski*, 31 F. Supp. 3d 952, 962 (S.D. Ohio 2014) (quoting United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)).

**III.    Analysis**

This Court is acutely aware of Jackson Sawall's personal history that led to the events of this conviction. This Court is further aware of the life Jackson had been building for himself when he was charged with this offense, pled guilty to the offense, and ultimately had his bond revoked by this Court, not because of his behavior on pretrial release but because of the Court's own concerns.

While Jackson (and his defense counsel) disagreed with this Court's decision to commit him, he understood the Court's overall concern about his potential danger to both himself and others. That question remained for this Court as Jackson had vocalized some admittedly horrific idealizations back when he was in Florida, and formal testing had never been completed to determine if Jackson still had elements of some of these provisional diagnoses, primarily concerns with any schizoaffective or antisocial personality disorders.

Now that we have that formal testing completed by the doctors at Butner, we understand that it is unlikely that Jackson suffers from these particular maladies, though he has some signs of a depressive order that is in remission. While psychiatric disorders ebb and flow in a manner consistent with external stimuli as well as internal brain chemistry, this diagnosis is consistent with both what the defense and the Government have believed all this time, that Jackson's

5

present mental status does not make him a danger to him or others.

So stripping away these specific concerns (or at least hopefully having evaluated and alleviated these concerns to the satisfaction of this Court), where does that leave Jackson? Nothing that was included in Jackson's original sentencing memorandum has changed other than Jackson now asking for supervised release rather than probation. We know that Jackson experienced a remarkably difficult childhood that seemed tailor made to put him on the path to this charge. We know that the fulcrum in Jackson's life took place when he along with co-defendants Frost and Christopher Cook are pulled over by law enforcement in Columbus. While Frost and Cook did not let this event be the end of their criminal planning, that was enough for Jackson. Perhaps the challenge is for us to remain free of cynicism at the idea that Jackson had turned his life around in such a substantial way by the time this offense caught up to him, but that is what happened. While it would be naïve to suggest that Jackson enjoys all the same support he had prior to when the news of his arrest and charge came to light, he retains that support from the people who matter most to him. Jackson continues to support the undying support of his grandparents who took him in after he left Columbus. He has the support of his former boss at Certified Professional Restoration, who remains eager to bring him back to his company (see attached letter). Perhaps more than anyone else, Jackson has the unwavering support of his girlfriend, Lily Kocha. This Court is keenly aware of Lily's presence in Jackson's life and their feelings about one another. The same connection that allowed Jackson and Lily to build a life together is the same connection that allows her to remain by his side. If Jackson is fortunate in one aspect in his life, it is that he has this element of structure and support waiting for him after this chapter ends. This support structure, however, will not remain forever, as time has a way of fading memories and connections. While it is understood that Jackson will need to continue to

6

engage in mental health counselling when he begins supervised release, having rewarding work and a supportive family is therapeutic in its own right.

This Court should also consider the sentences handed down in this matter to Jackson's coconspirators by comparison. Jackson, by all accounts, stopped engaging in this criminal behavior several months before Frost and Cook. Frost was identified by the Government as the leader and planner of the small group. Meanwhile, based on counsel's understanding, Cook had demonstrated a continued idealization of white nationalism even after pleading guilty to this offense. While both Frost and Cook both identified some mitigating ACE factors that shaped their own lives, they pale in comparison to the unique indignities of Jackson's life story. It stands to reason that based on factors, Jackson would receive a sentence less than the 60-month sentence Frost received (which in turn was less than Cook's sentence).

As this case finally draws to a close, counsel will reiterate that the punitive aspects of sentencing have more than been met. Jackson has managed to keep a positive attitude even as the last 16-months of incarceration have been clouded in uncertainty for him. Jackson maintains this positivity because he knows there is something better waiting for him on the other side. If we are satisfied that he is not a danger to society or himself, and that he has paid an adequate penalty for his past actions, then it is time to give Jackson the opportunity to show this Court that he will grow into the man we all know he can be.

**IV. Conclusion**

In light of his history and characteristics, the nature and circumstances of this offense, and the sentencing range established for this offense, Jackson Sawall respectfully requests a sentence of time served with a significant supervised release component. Mr. Sawall submits that this sentence is sufficient, but not greater than necessary, to punish him for his offense, deter others, and to protect the public.

Respectfully submitted,

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

/s/ Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Assistant Federal Public Defender
Office of the Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Soumyajit_Dutta@fd.org

*Attorney for Defendant*
*Jackson Sawall*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record on the date of filing.

    /s/ Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Soumyajit_Dutta@fd.org

January 24, 2024

Jackson Sawall

87777509

FMC Butner

Federal Medical Center

P O Box 1600

Butner, NC 27509

To whom it may concern,

I am writing for the second time on Jackson Sawall's behalf. While there has been a decision made on the sentencing for Jackson following his actions decisions as a teen some years ago, the grown person I knew for many months, that worked for me, was by then in counseling and led a good hard working life with a woman who loved him. All of which kept him on a path to success that he was pursuing. He was someone I had great faith in to go meet customers in their homes and set their fears and frustrations aside while he helped them get their homes back together after a flood, water damage, fire whatever may have happened to their home.

This letter then is to let you know that who he was then is someone I would gladly rehire. It may expose the company to scrutiny as we do not hire ex-convicts. But I believe in him enough that it is a risk I am willing to take. He is worth it. The man I knew was a kind soul who genuinely cared about people. Did he have a history of issues having been raised the way he was? Yes. Did he spend too many hours in front of a computer as a teenager while being left untended? Yes. From that influence did he make some poor choices? Yes. Did anyone actually come to any harm? Not to my knowledge.

So yes, I would hire him back and yes, he was an exemplary employee. I'd take a whole crew of guys like him and trust him to do his job. I'm prepared to do it now. He has a job here upon his return.

Please reach out to me if you have any questions or concerns.

Kind Regards,

Matthew Everett,

President CPR+

920-843-1270